**ORITANI SAVINGS AND LOAN ASSO-CIATION, a corporation organized under the Banking Laws of New Jersey**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND (A Maryland Corp.)**

**Fidelity & Deposit Company of Maryland, Appellant.**

**No. 91–5874.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) June 12, 1992.

Decided March 16, 1993.

---

**8.** The government argues that the amendment, which added the time limitation on the use of prior felonies, is not applicable to Knight because it is not retroactive. The amendment was enacted after Knight committed his crimes and

was convicted, but before the date of sentencing. Because we hold that even if the statute applied to Knight, he had not completed his sentence ten years before his current conviction, we need not reach the retroactivity issue.

Andrew T. Fede, Contant, Scherby & Atkins, Hackensack, NJ, for appellee.

James M. Mulvaney, Joseph P. McNulty, Michael S. Stein, McElroy, Deutsch & Mulvaney, Morristown, NJ, for appellant.

Before: MANSMANN, SCIRICA and ROTH, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge.

This case arises from an insurance coverage dispute stemming from an incidence of telephone fraud perpetrated against Oritani Savings and Loan (Oritani). Oritani brought suit against Fidelity and Deposit Company of Maryland (Fidelity), seeking a declaratory judgment that Fidelity is obligated to indemnify Oritani under an insurance contract, a Savings and Loan Blanket Bond, executed between the parties. The district court held that Fidelity is obligated under the policy because telephone fraud is covered under the "On Premises" coverage provision in the policy. We disagree and will reverse. Moreover, because we find that, as a matter of law, no coverage is provided, we will remand to the district court to enter judgment in favor of the appellant.

### I.

During the time period at issue, Oritani and Fidelity had a valid insurance contract. The blanket bond covered "[a]ll the Insured's offices or premises in existence at the time this bond becomes effective...." The provisions of this bond provide coverage for:

(A) Loss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others;

(B)(1) Loss of property resulting directly from

(a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof while the Property is lodged or deposited within offices or premises located anywhere, or

(b) theft, false pretenses, common law or statutory larceny committed by a person

(i) present in an office of, or on the premises of, the Insured, or

(ii) present on the premises in which the Property is lodged or deposited.

It is undisputed that Oritani suffered a "loss of property" within the meaning of

·the policy. However, ·Fidelity contests whether this loss of property is covered under the policy.

Oritani suffered the loss from the following scheme of telephone fraud: On May 10, 1988, Jack Rowe, a vice president of Oritani responsible for processing wire transfer requests for Oritani's customers, received a telephone call from a person who identified herself as "Debbie" and said she was an employee of Oritani's branch office in Ho-Ho-Kus, New Jersey.[1] "Debbie" requested that Mr. Rowe effect a wire transfer of $85,300 from an Oritani customer account which "Debbie" identified by name, account number, and all other appropriate information. Mr. Rowe executed the transfer. On May 13, 1988, a similar request for a wire transfer for $87,300 from the same correctly identified account was made by "Susan," who also claimed that she was an employee of Oritani's Ho-Ho-Kus branch office. Mr. Rowe executed this transfer as well. On May 20, 1988, Mr. Rowe learned that the Ho-Ho-Kus office had no record of these wire transfers and that the identified account had insufficient funds to cover the transfers. However, the wired funds had already been disbursed by the recipient banks; Oritani therefore suffered a loss of $172,600.

While Mr. Rowe apparently made no effort to verify whether funds existed to cover the wire transfers, he testified that he followed his normal procedure in effecting the transfers. Moreover, Oritani has admitted that Mr. Rowe was not a knowing participant in the fraudulent scheme. Oritani has investigated the incident and has been unable to determine whether the persons who made the phone calls were actually employees of Oritani and/or present in Oritani's branch office. The parties concede that Mr. Rowe did believe that "Debbie" and ."Susan" were employees of Oritani calling from the Ho-Ho-Kus branch office. .

Oritani initially claimed that Fidelity breached its obligations under Insuring Agreement (B) of the insurance contract by refusing to provide coverage for Oritani's loss ("Count One") and that Fidelity's denial of coverage constituted bad faith ("Count Two"). Fidelity moved for summary judgment which was denied by the district court. . *See Oritani Savings & Loan Ass'n v. Fidelity & Deposit Co. of Md.*, 741 F.Supp. 515 (D.N.J.1990) (*"Oritani I"*.) On July 23, 1990, Fidelity filed a motion for reargument. Oritani opposed this motion and sought leave to amend its complaint to assert a claim for coverage under Insuring Agreement (A) ("Count Three"). On September 24, 1990, the district court denied Fidelity's motion for reargument, granted Oritani leave to file an amended complaint, and granted summary judgment for Oritani on Count One. *See Oritani Savings & Loan Ass'n v. Fidelity & Deposit Co. of Md.*, 744 F.Supp. 1311 (D.N.J.1990) (*"Oritani II"*). The amended Count Three of Oritani's complaint was dismissed by the district court. *See Oritani Savings & Loan Ass'n v. Fidelity & ·Deposit Co. of Md.*, No. 89–5355, 1991 WL 498924, 1991 U.S.Dist. LEXIS 14901 (Oct. 3, 1991) (*"Oritani III"*). Count Two was dismissed by Stipulation filed October 11, 1991. Fidelity filed its Notice of Appeal on October 24, 1991.

## II.

The district court had jurisdiction over this diversity case under 28 U.S.C. § 1332(a). Appellate jurisdiction for this appeal from a final order of the district court is predicated upon 28 U.S.C. § 1291.

This court's review of a grant of summary judgment is plenary. *See Erie Telecommunications, Inc. ·v. City of Erie*, 853 F.2d 1084, 1093 (3d Cir.1988). "On review the appellate court ·is required to apply the same test the district court should have utilized initially." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

A court may grant summary judgment only when the submissions in the record "show that there is no genuine issue as to

---

**1.** Oritani did, in fact, have a branch office in Ho-Ho-Kus. Mr. Rowe did not recall whether there was anyone named "Debbie" working in that office at that time.

any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether summary judgment is appropriate, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12.

■ This appeal involves the construction of the parties' insurance contract. The parties do not dispute the material facts giving rise to this case. Under New Jersey and federal law, questions of contract construction are questions of law subject to plenary review on appeal. *See Cooper Labs. v. International Surplus Lines*, 802 F.2d 667, 671 (3d Cir.1986).

### III.

■ New Jersey law prescribes construing an insurance contract to comport with the parties' intent and reasonable expectations. *See McNeilab, Inc. v. North River Ins. Co.*, 645 F.Supp. 525, 546 (D.N.J. 1986); *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 495 A.2d 406, 414 (1985). New Jersey recognizes that the language of insurance contracts is often the result of technical semantic constructions and unequal bargaining power. *Sparks*, 495 A.2d at 412. Therefore, New Jersey law generally embraces the application of the doctrine of *contra proferentum* to insurance contracts. "The recognition that insurance policies are not readily understood has impelled courts to resolve ambiguities in such contracts against the insurance companies." *Id.*

■ Even when insurance contracts are not patently or technically ambiguous, New Jersey requires courts to construe "contracts in accordance with the reasonable expectations of the insured." *Id.* The parties' reasonable expectations must be examined when "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *State Dept. of Envt'l. Protection v. Signo Trading Int'l, Inc.*, 130 N.J. 51, 612 A.2d 932, 938 (1992) (quoting *Weedo v. Stone–E–Brick Inc.*, 81 N.J. 233, 405 A.2d 788, 795 (1979)). Coverage will be provided if policy language is "insufficiently clear to justify depriving the insured of her reasonable expectation that coverage would be provided." *Sparks*, 495 A.2d at 413. Our constructive task is twofold. First, we must determine if any patent ambiguity exists in the policy language such that coverage must be provided. Second, if such an ambiguity does not exist, we must determine, were coverage denied, whether the policy language is insufficiently clear such that the average policyholder would be deprived of a reasonable expectation of coverage.

■ The crucial policy language provides the following coverage:

### On Premises

(B)(1) Loss of Property resulting from . . .

(b) theft, false pretenses, common law or statutory larceny committed by a person

(i) present in an office of, or on the premises of, the Insured, or

(ii) present on the premises in which the Property is lodged or deposited.

It is undisputed that the telephone fraud at issue involved false pretenses. Moreover, Oritani has conceded that it cannot prove that the persons making the telephone calls to Mr. Rowe were physically present in its offices or on its premises. Nevertheless, the district court held that this "On Premises" provision was ambiguous and that coverage had to be afforded. The district court found first that the language of section (B)(1)(b)(i) could modify either the word "person" or the phrase "false pretenses" and second, that the word "present" in section (B)(1)(b)(i) could mean either "physically present" or "constructively present." *See Oritani I*, 741 F.Supp. at 520–23. We find neither conclusion persuasive and hold

that the policy language unambiguously denies coverage in the present case.

We find that reading the language of section (B)(1)(b)(i) to modify "false pretenses" rather than "person" "strain[s] the language of the policy to find an ambiguity where there is none in order to grant coverage that does not exist." *McNeilab*, 645 F.Supp. at 543. A logical approach to grammar and sentence construction prescribes finding that the language of section (B)(1)(b)(i) modifies only the word "person." First, there is linguistic consonance only between the modifying language and the word "person." The language "present in an office of, or on the premises, of, the Insured" syntacticly flows from and naturally describes the word "person." A person is an animate object that can be described properly as "present" in a given location. In contrast, the descriptive language at issue neither syntacticly flows from nor properly describes the phrase "false pretenses." "False pretenses" is the act of "illegally obtaining money, goods, or merchandise from another by fraud or misrepresentation." Black's Law Dictionary 602 (6th ed. 1990). An act is neither properly nor naturally described as "present" in a given location. Rather, an act may "occur" or "be committed" in a location. Construing subsection (b)(i) as modifying the phrase "false pretenses" illogically introduces linguistic dissonance into the "On Premises" clause. If the drafters had meant to modify "false pretenses," they would have used the word "occurring" not the word "present" to begin the modifying phrase.

Second, the position of the modifying language within section (B)(1)(b) strongly indicates that the word "person" is the object of modification. The modifying language directly follows the word "person" and descriptively clarifies that word.[2] If the drafters had meant to say that either the "person" committing false pretenses or the false pretenses itself were to be "present" in the described locations, the modifying language would have directly followed the enumerated crimes and preceded the word "person." In such a construction, the modifying language would apply both to the crime itself and to a person committing that crime. Furthermore, the outline format of section (B)(1)(b) confirms this analysis. Subsections (b)(i) and (b)(ii) both function as descriptive phrases that follow directly from the word "person" as the object of description.

Moreover, the drafting history of the blanket bond bolsters the conclusion that subsection (b)(i) was designed, and has been understood by the banking industry, to modify only the word "person." The bond involved in the present case was substantially revised in 1980. The "On Premises" clause in the new bond is quite different from that in the bond's previous version. The previous clause afforded the following coverage:

### ON PREMISES

(B) Any loss of property through robbery, burglary, common-law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious disappearance, damage thereto or destruction thereof, whether effected with or without violence or with or without negligence on the part of any of the Employees, and any loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of Property, *while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere*, except in an office hereinafter excluded or in the mail or with a carrier for hire, other than an armored vehicle company, for the purpose of transportation.

(emphasis added). Fidelity contends that this previous bond provision afforded coverage for loss through false pretenses based solely upon the location of the *prop-*

---

2. For an illuminating discussion of the relationship between syntactical structure and language interpretation, see William Strunk, Jr. & E.B. White, The Elements of Style 28–31 (3d ed. 1979) ("The position of the words in a sentence is the principal means of showing their relationship.").

*erty* taken, while the current bond provision affords coverage for loss through false pretenses based upon the location of the *person* taking the property. A comparison of the language of the current bond and the previous bond reveals the merit of Fidelity's contention. Subsection (B)(1)(b) of the current bond specifically includes the phrase "committed by a person" with following descriptions of locations, while the previous bond had no language referring to the location of the person committing false pretense. Additionally, Insuring Agreement (B) of the previous bond afforded coverage for losses from crimes such as "robbery and burglary" in the same way as losses from "false pretenses." In the current bond, however, losses of property from "robbery and burglary" are covered under section (b)(1)(a) when the "Property is lodged or deposited within offices or premises located anywhere," while loss of property from "false pretenses" is covered under section (B)(1)(b) only when "committed by a person" on the premises of the Insured or in which the property is located. The current separation of "false pretenses" from "robbery and burglary" indicates that coverage for these crimes is determined differently.

Banking industry publications emphasize that the 1980 revisions to Insuring Agreement (B) indeed represent a shift from a property-based to a person-based construction of the "On Premises" clause. One bank vice president explained that in the new clause, "[t]he risks of theft, false pretenses, common law or statutory larceny have been restricted to crimes perpetrated by a person present in an office or on the premises. The old bond form did not contain this requirement...." John Robert James, *A Banker's Look at the Revised Blanket Bond,* Risk Management, Jan. 1981, at 22. The American Bankers Association's Digest of Bank Insurance (4th ed. 1981) similarly states that, under the revised bond, coverage for losses from "[t]heft, false pretenses, or larceny ... are limited to those involving acts committed by a person present in an office or on the premises of the insured bank ... [or] present on the premises in which the Property is lodged or deposited." *Id.* at 1.3.11.

The district court relied upon a number of cases that construed previous versions of the blanket bond and found for the insured party even when false pretenses had not occurred on the insured's property. *See Oritani I,* 741 F.Supp. at 520–21. We find such cases unpersuasive in light of the logical meaning of the current "On Premises" clause and its drafting history.

Moreover, the district court reasoned that if Fidelity's construction were adopted "such that the phrase 'on the premises of the insured' required a person committing the false pretense to be present at the insured's office, the phrase 'on the premises of the insured' in the policy would be surplusage." *Id.* at 521. We disagree. First, the terms are not identical. One leading dictionary defines "premises" as "a tract of land with the building thereon," and "office" as "a place where a particular kind of business is transacted or a service is supplied." Websters Ninth New Collegiate Dictionary 820, 928 (1984). Therefore, "premises" could have a broader scope than "office." Second, Fidelity plausibly asserts that since both terms were included in the "On Premises" clauses of previous bonds, both terms were needed in the current version to assure full coverage. Finally, some courts have found a distinction between "premises" and "office" in the context of the banking industry. *See, e.g., First Nat'l Bank in Plant City, Fla. v. Dickinson,* 396 U.S. 122, 126, 137, 90 S.Ct. 337, 339, 345, 24 L.Ed.2d 312 (1969) (considering a "branch *office*," a "stationary *off-premises* receptacle for receipt of monies intended for deposit") (emphasis added).

We also find incorrect the district court's determination that the word "present" is ambiguous because it could refer either to actual presence or to constructive presence. "Present" is not defined in the blanket bond. "In the absence of a specific definition in an insurance policy, the words used by the insurer must be interpreted in accordance with their ordinary, plain and usual

meaning." *Killeen Trucking, Inc. v. Great Am. Surplus Lines Ins. Co.*, 211 N.J.Super. 712, 512 A.2d 590, 591 (1986). At first blush, it is difficult to comprehend how according a term in an insurance policy a "constructive" meaning could comport with New Jersey's mandate that such terms be accorded "their ordinary, plain and usual meaning." Indeed, Black's Law Dictionary (6th ed. 1990) defines "constructive" as:

> That which is established by the mind of the law in its act of *construing* facts, conduct, circumstances, or instruments. That which has not the character assigned to it in its own essential nature, but acquires such character in consequence of the way in which it is regarded by a rule or policy of law....

*Id.* at 313. Furthermore, the definition of "presence" relied upon by the district court partly states: "The existence of a person in a particular place at a given time particularly with reference to some act done there and then. Besides actual presence, the law recognizes *constructive* presence...." *Id.* at 1183. These definitions recognize a clear distinction between actual presence, the ordinary use of the term, and constructive presence, a legal creation.

The district court supplemented its linguistic analysis by reference to the use of the term "constructive presence" in the criminal field and to *Bank of Dade v. Fidelity and Deposit Co. of Md.*, 483 F.2d 735 (5th Cir.1973), a case that interpreted the previous, 1969 version of the "On Premises" clause. Initially, we find that the use of "constructive presence" in the field of criminal law and procedure is of little persuasive value in the present case. "Constructive presence" may be used in criminal law to effectuate policy goals such as broadening criminal liability or clarifying procedural rights. However, in construing insurance contract language, New Jersey law prescribes giving terms their ordinary meaning so that coverage is not dependant upon "technical encumbrances." *See Meier v. New Jersey Life Ins. Co.*, 101 N.J. 597, 503 A.2d 862, 870 (1986). In the present context, it is improper to place judicial constructs above a term's ordinary meaning.

Moreover, *Bank of Dade* is inapposite to the present case. *Bank of Dade* interpreted the previous version of the "On Premises" clause, which based coverage on the location of property lost through a crime such as false pretenses. *See* 483 F.2d at 736. The court in *Bank of Dade* held that coverage was afforded for the loss of money taken by a bank president and delivered to a kidnapper as ransom for the return of his wife and daughter. The court reasoned that the property was lost when the bank president took the money as demanded by the kidnapper such that the loss occurred "on" the bank's "premises." *See id.* at 737–38. *Bank of Dade* involved no interpretation of the language at issue in the present case. Furthermore, it did not mention, nor apply, any conception of "constructive presence."

Far more relevant is *Southern Nat'l Bank of N.C. v. United Pac. Ins. Co.*, 864 F.2d 329 (4th Cir.1989), which addressed and rejected the "constructive presence" interpretation adopted by the district court in the present case. In *Southern National*, a customer fraudulently induced a bank employee to purchase fictitious treasury bonds through a number of transactions all executed over the telephone while the customer was in his New York office. The court held that the "On Premises" clause in the current Bankers Blanket Bond afforded no coverage, finding that "[t]he crucial factor in determining whether the 'on premises' requirement has been satisfied is ... [the defrauder's] location when he engages in misrepresentations." *Id.* at 332. The court explained:

> Under SNB's theory, a person who used a telephone or computer link from anywhere in the world to make a misrepresentation to a bank and who later received money in hand as a result of the deceit would be deemed to have been on the same premises as the money when he or she used false pretenses. Such a theory would directly contravene the purpose of the "on premises" language.

Commentators, including those in the banking industry, have emphasized that the "on premises" requirement is designed to exclude coverage for losses from fraud perpetrated by telephone or computer, except in those rare instances where the perpetrator phones or uses a computer hook-up from the property of the bank itself or from the property of a custodian entrusted by the bank to safeguard the funds.

*Id.* at 332.

We find this reasoning persuasive. Numerous banking industry publications have stated that the provisions at issue exclude coverage for the kind of telephone fraud involved in the present case. The American Bankers Association, Digest of Bank Insurance (4th ed. 1981), expressly states:

> Generally, false pretenses occur during a face-to-face meeting between a bank employee or other custodian and a party to the fraud. Unless this happens on the premises of the insured bank, the loss is not now covered under Insuring Agreement (B). Losses involving false pretenses by a telephone call are not covered, unless it can be proved that the call came from a person who was on the premises of the insured bank....

*Id.* at 438. *See also* James, at 22 ("... the [bond's] revised wording clearly indicates that loss from crimes perpetrated off the premises by telephone or other means is not covered."). The district court's "constructive presence" analysis comports with neither principles of New Jersey insurance law nor the understanding of the banking industry.

We conclude that there is no patent ambiguity in Section (B)(1)(b) of the Bankers' Blanket Bond. The descriptive language in subsection (b)(i) reasonably may be construed as modifying only the word "person." Moreover, we find that the word "present" in subsection (b)(i) is unambiguous.

Having determined that no ambiguity exists in the relevant policy language, we must now examine whether denying coverage would deprive the average policyholder of a reasonable expectation of coverage. In light of the relevant drafting history and statements of the banking industry previously discussed, we find that the average banking institution would not reasonably expect coverage in the present case.

■ The doctrine of reasonable expectations protects insureds from the exigencies of insurance companies' superior bargaining power and technical expertise in drafting insurance contracts. *See Meier*, 503 A.2d at 869; *McNeilab*, 645 F.Supp. at 545–46. The present case concerns a particularized type of insurance policy which was partly crafted and widely discussed by the insured banking industry. *See U.S. Fire Ins. Co. v. F.D.I.C.*, 981 F.2d 850, 851 (5th Cir.1993) (noting that this blanket bond "was the result of a collaborative effort between the American Bankers Association and the American Surety Association"); James, at 21 ("For more than three years, an Insurance and Protection Division of the American Bankers Association (ABA) ha[d] been working with a subcommittee of the Surety Association of America's (SAA) Fidelity and Public Advisory Committee to revise the Bankers Blanket Bond, Standard Form No. 24."). The banking industry certainly had some bargaining power to effect changes in the language of the insurance policy at issue. Moreover, numerous banking industry publications, including the American Bankers Association's Digest of Bank Insurance, at 1.3.12, expressly state that the coverage sought by Oritani is not afforded by the blanket bond.[3]

We find that the average banking institution would not reasonably expect coverage recognized as unavailable by the banking industry. Indeed, New Jersey law proscribes us from straining to construe insurance policies to provide insurance coverage

---

3. Therefore, the present case is far different from those where a sophisticated insured challenged a standard insurance industry policy that

was subject to no bargaining. *See, e.g., New Castle County v. Hartford Accident and Indem. Co.*, 933 F.2d 1162, 1188–1192 (3d Cir.1991).

to sophisticated and powerful insureds who have significant bargaining power and expertise in drafting insurance contracts. *See Werner Indus., Inc. v. First State Ins. Co.*, 112 N.J. 30, 548 A.2d 188, 192 (1988) (per curiam); *McNeilab*, 645 F.Supp. at 545–46. We conclude that the parties' reasonable expectations are best fulfilled in the present case by denying coverage.

## IV.

For the foregoing reasons, we find that, as a matter of law, no coverage is afforded under the Blanket Bond. We will, therefore, reverse the decision of the district court and remand this case to the district court to enter judgment in favor of appellant.